## No. 28072

### The People of the State of Colorado v. Darrell Howell

(586 P.2d 27)

Decided October 23, 1978.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, J. Stephen Phillips, Chief, Criminal Appeals, Steven Gold, Assistant, for appellee.

John A. Purvis, Acting State Public Defender, Steven K. Jacobson, Deputy, for appellant.

*En Banc.*

MR. JUSTICE CARRIGAN delivered the opinion of the Court.

This appeal arises from a speical proceeding before a Pueblo district court jury which determined that the appellant Howell was not eligible for release from commitment to the Colorado State Hospital. Sections 16-8-115 and 16-8-120, C.R.S. 1973. Appellant here claims that the statutory

standard governing eligibility for conditional release,[1] as applied to him, violated his right to due process of law. We do not agree.

Appellant was first committed to the Colorado State Hospital on March 11, 1971. That commitment resulted from a finding that he was not guilty by reason of insanity after he had been charged with murdering a bartender in Jefferson County. In March, 1973, he was again found not guilty by reason of insanity in a first-degree murder case arising from the killing of a Colorado State Hospital employee. After the latter finding, he was confined at the Colorado State Penitentiary as a state hospital patient. Except for a brief time when he was returned to the state hospital, he remained in the maximum security section of the penitentiary and was still being held there at the time of the March, 1977, release hearing which gave rise to this appeal.

In August, 1975, the appellant filed a motion for a release evaluation and hearing under section 16-8-115, C.R.S. 1973. Pursuant to court order, a psychiatric examination was conducted. The superintendent of the Colorado State Hospital, basing his opinion on Howell's record and the psychiatrist's report, recommended that Howell not be discharged because he continued to suffer from a mental disease "likely to cause him to be dangerous . . . to himself, to others, or to the community in the reasonably foreseeable future."[2]

Upon Howell's request, an independent psychiatrist was appointed to examine him. As a result of that examination in January, 1976, this second psychiatrist concluded that, although Howell was not legally insane, he should not be discharged from the hospital for he was imminently dangerous to himself and others.

In January, 1977, another release examination was conducted by the Disposition Committee of the State Hospital's Forensic Psychiatry Division. This committee unanimously agreed that Howell still represented a danger to himself and others. They recommended that he be retained under criminal commitment.

A trial to decide eligibility for release was commenced in March, 1977, resulting in the jury's finding that Howell should not be discharged. Howell, the only witness testifying in support of his motion, stated that he believed he was no longer violent and could control himself in the future. In contrast, seven psychiatrists, four psychologists, and three social workers all testified that he was dangerous. He was uniformly diagnosed

---

[1] *"Applicable tests for release.* (1) As to any person charged with any crime allegedly committed on or after June 2, 1965, the test for determination of a defendant's sanity for release from commitment, or his eligibility for conditional release, shall be: 'That the defendant has no abnormal mental condition which would be likely to cause him to be dangerous either to himself or to others or to the community in the reasonably foreseeable future." Section 16-8-120(1), C.R.S. 1973.

[2] *Id.*

as having a sociopathic personality with chronic antisocial aggressive tendencies. This type of behavior pattern was evidenced by impulsive, violent reactions to stressful situations, difficulty in learning from experience, and an absence of feelings of remorse.

Howell's past behavior was the most important factor upon which the predictions of future dangerousness and the diagnosis of sociopathic personality disorder were predicated. His history is replete with antisocial, dangerous conduct.

Howell admitted during the course of an interview with a state hospital physician that, at age thirteen, upon seeing another boy embracing his girlfriend, he had beaten the boy with a baseball bat and left him in a field to die. Howell also recounted to this physician that he had shot another man four to five times. Moreover, he admitted that he had shot his common law wife in each leg after discovering her infidelity.

From 1951 through 1967, Howell had been convicted of six aggravated robberies and two assaults with deadly weapons. He had served time in the Colorado State Reformatory and the Colorado State Penitentiary for these convictions.

In 1970 Howell had walked into a crowded bar, ordered a drink and then shot the bartender-owner five times. Earlier the bartender had pressed assault charges against Howell, and had refused to withdraw them despite Howell's threats to return and "settle things" if the charges were not dropped. For this killing Howell was charged with first-degree murder but was found not guilty by reason of insanity and committed to the Colorado State Hospital.

In his first two years at the state hospital, Howell reportedly threatened hospital employees and assaulted another hospital patient. Consequently he was removed from the open ward and placed in the hospital's maximum security ward.

In October, 1972, Howell cornered two hospital employees and threatened them with a knife. A third employee, Baldwin, intervened. Howell slashed Baldwin's throat, killing him. Howell was again charged with first-degree murder and, in 1973, was again found not guilty by reason of insanity. Recommitted to the state hospital, he was transferred to the maximum security division of the state penitentiary for "safe-keeping."

From 1973 to 1976, Howell's aggressive behavior continued. It was reported that he had threatened to kill hospital employees, and he indicated that he would decapitate one of the prison guards at his first opportunity. He was allegedly involved, with other inmates, in throwing glass at the guards. Howell admitted to a therapist that he had a list of people marked for vengeance including several hospital employees and a district court judge. Although another person was tried and convicted for the murder of a penitentiary inmate, Howell claimed that he had stabbed this inmate to death because the victim had placed his name on a petition without his consent.

Another factor considered in the medical diagnosis and opinion of imminent dangerousness was Howell's "affect," that is, the inappropriateness of his responses to factual circumstances. Howell's expressions of feelings often were inconsistent with what he was saying. For example, Howell expressed verbally that he had changed, but in one psychologist's opinion, the feeling that normally should accompany such a statement was absent. At the January, 1977, examination Howell stated he was sorry for the death of Baldwin, the hospital employee, yet he was smiling as he made that statement. Howell's "affect" remained basically unchanged throughout his commitment.

The third factor contributing to the unanimous opinion that Howell would be dangerous in the reasonably foreseeable future was the fact that a sociopathic personality disorder is usually a lifelong, chronic problem with successful treatment having been reported rarely. Although therapy might have helped to alter the underlying factors that had been causing his abnormal behavior, Howell often had refused therapy. Without therapy, the medical opinion was that Howell probably would continue in his previous homicidal behavior pattern.

■ Howell does not challenge these facts or conclusions. Rather he contends that the standard set forth in section 16-8-120, C.R.S. 1973, for determining eligibility for conditional release is unconstitutionally vague and ambiguous. He contends that to comply with due process requirements, the statutory standard must be judicially construed to require evidence of *more recent* overt acts to justify a finding of likelihood of dangerousness. Alternatively, he argues that the burden of proof must be shifted from him to the state. In our view, however, neither of these proposed alternative constructions is necessary to uphold the statute against the due process attack. Rather we hold that the statutory standard for determining eligibility for conditional release is constitutional not only on its face but also as applied to Howell.

■ Although a court should take full advantage of the expert psychiatric and psychological testimony offered by the parties, the ultimate determination of whether one has an abnormal mental condition likely to cause him to be dangerous in the reasonably foreseeable future is for the jury. "Dangerous" is a word of common connotation to people of ordinary intelligence and it can be readily comprehended and applied by jurors.

■ Furthermore, the fact that the determination of dangerousness involves a prediction of the appellant's future conduct rather than mere characterization of his past conduct does not violate due process. A required finding is the likelihood of dangerous conduct in terms of probability, not mere possibility. Due process does not require certainty of prediction, for that cannot realistically be expected. *See United States v. Ecker,* 543 F.2d 178 (D. C. Cir. 1976); *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975).

■ The appellant argues that due process required the finding of likelihood of future dangerousness to be based on evidence of *recent* overt acts, attempts, or threats. He does not, however, suggest a definition of "recent." Most of the cases cited by the appellant in support of his contention discuss the evidence needed to justify an original *civil* commitment. *Doremus v. Farrell,* 407 F. Supp. 509 (D. Neb. 1975); *Bell v. Wayne County Gen. Hosp. at Eloise,* 384 F. Supp. 1085 (E.D. Mich. 1974); *Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D. Wisc. 1972). *But cf., State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975) (standards for commitment in a criminal case). The reasoning of these cases is inapplicable in determining the appropriate evidence needed to establish eligibility for *release* from commitment following a finding of not guilty by reason of insanity in a criminal case.

Typically one who has already been committed does not have an many opportunities to manifest his dangerousness by acts or threats as were available when he was living unrestrained in the outside world. The institutional environment offers routines, restrictions and discipline which may be unavailable to the patient in the outside world. Moreover, most opportunities to act out hostile impulses are obviated by security and isolation measures in the institution. This reasoning is especially pertinent here where much of the appellant's "recent" history was accumulated in the maximum security facilities of the State Hospital and the penitentiary. The absence of overt acts may only reflect successful restraint by the institution and may be no indication of the patient's lack of dangerousness if released from that environment. Thus it would be illogical to base a conclusion regarding a confined patient's likely dangerousness if released to an open society on his recent behavior, for he has had no recent opportunity to react to the temptations and opportunities for aggression offered by an open society.

■ Because he was contesting the recommendation of the custodial institution, the appellant bore the burden of proving by a preponderance of the evidence that he was not likely to be dangerous. Section 16-8-115, C.R.S. 1973; *People v. Dist. Ct.,* 189 Colo. 151, 538 P.2d 469 (1975). He asserts that to satisfy due process requirements the burden of proof must always be placed upon the proponent of continued institutionalization. We disagree.

■ The appellant originally claimed and submitted sufficient evidence to establish his insanity. Thus he was held not responsible for acts that otherwise would have been subject to criminal sanctions. Because of the prior judicial determination that his abnormal mental condition rendered him not accountable for two homicides, the public has a special interest in his continued confinement for the safety of others. Thus when he seeks release claiming he is no longer dangerous, and the hospital after

examination and evaluation disagrees, it is neither unfair nor irrational to require that he bear the burden of proving he is no longer dangerous to himself or others. *Accord, In re Franklin,* 7 Cal.3d 126, 496 P.2d 465, 101 Cal. Rptr. 553 (1972); *State v. Allan,* 166 N.W.2d 752 (Iowa 1969); *Newton v. Brooks,* 246 Or. 484, 426 P.2d 446 (1967).

Accordingly the judgment is affirmed.