**The PEOPLE of the State of Colorado, Petitioners–Appellees,**

v.

**Johnnie Sue STEVENS, Respondent–Appellant,**

and

**Department of Institutions, Intervenor–Appellee.**

No. 87SA29.

Supreme Court of Colorado, En Banc.

Sept. 12, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Barbara Widick, Asst. Atty. Gen., Denver, Joanna D. Hellman, Asst. Co. Atty., Littleton, for petitioners-appellees.

Susan J. Dycus, Sally S. Townshend, Denver, for respondent-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Carolyn Lievers, First Asst. Atty. Gen., Denver, for intervenor-appellee.

VOLLACK, Justice.

Johnnie Sue Stevens appeals the decision of the Arapahoe County District Court approving her certification for short-term mental health treatment at the Fort Logan Mental Health Center. We affirm.

### I.

In March 1986, Stevens met an Air Force sergeant at a bus stop. They struck up a conversation. She told him she had unexpectedly been discharged from the Air Force and that her job did not generate enough income to pay her bills. She also told him she had just bought a gun. She showed it to him and said she planned to shoot herself with it. The sergeant even-

tually caught his bus without pursuing the matter.

The next day, Stevens happened to be across the street while the sergeant waited for another bus. She walked across the street to talk to him. She opened her bag, showed him the gun she had bought the day before, and said it was loaded. During the conversation, she told him she had met terrorists who were planning a "kamikaze raid against the White House," and that she knew people who had volunteered to kill the Air Force officer responsible for her military discharge. The sergeant reported the events of that day to his superior officers, and they in turn called the police.[1]

That night two Aurora police officers went to Stevens' apartment believing she had a gun and planned to commit suicide. She denied she planned to kill herself but admitted she had a gun. She became increasingly hostile to the officers, and they eventually subdued her and took her to the Fort Logan Mental Health Center for psychiatric treatment and evaluation.

Following a seventy-two hour evaluation, she was diagnosed as suffering from a paranoid personality disorder, and was certified for short-term treatment. She contested the certification at a hearing in the Arapahoe County District Court. The district court stated that Stevens had the "potential for dangerousness." It found that she was mentally ill and, as a result, a danger to herself or others, and ordered her to undergo involuntary treatment.

Stevens now appeals directly to this court pursuant to section 13–4–110(1)(a), 6A C.R.S. (1987). She claims that section 27–10–107, 11 C.R.S. (1982), is unconstitutionally vague and overbroad, both on its face and as applied to her. She argues

---

1. The police apparently received misinformation about what Stevens had told the Air Force sergeant. The police were under the impression that Stevens said she belonged to the terrorist group that planned to assassinate President Reagan and that she said she was going to "blow her head off." In fact, the sergeant testified that Stevens merely said she knew people who planned to assassinate President Reagan. The sergeant also stated that he had never told his superior officers Stevens had threatened to commit suicide the day before.

Stevens does not argue to this court that there was no probable cause to take her into custody for a seventy-two hour emergency evaluation pursuant to section 27–10–105(1)(a), although she has maintained throughout her hospitalization that she is not mentally ill and that there is a rational explanation for her conduct at all times.

that the term "dangerous" in section 27–10–107 is vague because it fails to specify the degree of dangerousness required to sustain an involuntary commitment, and overbroad because it permits commitment based on the mere possibility of dangerousness. She also argues that due process of law and the civil commitment statutes require consideration of less restrictive alternatives as a condition precedent to certification for short-term treatment.

## II.

■■■ Commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. *Jones v. United States*, 463 U.S. 354, 361, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983); *Curnow v. Yarbrough*, 676 P.2d 1177, 1183 (Colo.1984). Commitment pursuant to a statute whose terms are unduly vague violates the due process clause of the fourteenth amendment. *People v. Howell*, 196 Colo. 408, 412, 586 P.2d 27, 30 (1978); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 492, 102 S.Ct. 1186, 1190, 7 L.Ed.2d 362 (1982) (commercial free speech challenge to a head shop statute). Statutes enjoy a presumption of constitutionality, however, *People v. Moore*, 674 P.2d 354, 357 (Colo. 1984), and the party challenging them bears the burden of proving unconstitutionality beyond a reasonable doubt, *People v. Rowerdink*, 756 P.2d 986, 990 (Colo.1988).

■■■ A statute offends due process of law "if it is so vague that it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement." *Eckley v. Colorado Real Estate Comm'n*, 752 P.2d 68, 73 (Colo.1988) (citations omitted). A statute is not void for vagueness, however, if it fairly describes the forbidden conduct so that persons of common intelligence can readily understand its meaning and application. *People v. O'Cana*, 725 P.2d 1139, 1141 (Colo.1986). The language of the statute must be specific enough to give fair warning of the prohibited conduct, yet general enough to address the problem under var-

ied circumstances and during changing times. *People v. Castro*, 657 P.2d 932, 939 (Colo.1983). A statute that fails to set precise standards, however, may be given a constitutional interpretation through a limiting construction that accomplishes the purposes for which the statute was enacted. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed.2d 1031 (1942); *Hansen v. People*, 190 Colo. 457, 461, 548 P.2d 1278, 1281 (1976); *see also People v. Randall*, 711 P.2d 689, 692 (Colo.1985) (statutes capable of both constitutional and unconstitutional interpretations must be interpreted in constitutional fashion).

### A.

Predicting future violent behavior among the mentally ill is a difficult and controversial task. *See O'Connor v. Donaldson*, 422 U.S. 563, 584, 95 S.Ct. 2486, 2498, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring); Steadman, *Predicting Dangerousness Among the Mentally Ill: Art, Magic and Science*, 6 Int'l J.L. & Psych. 381, 381 (1983). Yet predictions of future behavior are inherent in showing that medical intervention is mandated. *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979); *People v. Taylor*, 618 P.2d 1127, 1136 (Colo.1980). Over the last two centuries, the dangerousness standard for involuntary commitment has developed in the United States. Comment, *Involuntary Civil Commitment: The Dangerousness Standard and Its Problems*, 63 N.C. L.Rev. 241, 245 (1984). According to the United States Supreme Court, involuntary commitment depends "not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his *potential for doing harm*, to himself or to others, is great enough to justify such a massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972) (footnote omitted) (emphasis added) (dictum). This potential for doing harm, which is synonymous with dangerousness, is incorporated into section 27–10–107. Section 27–10–107(1)(a) requires a determination that the patient is

mentally ill and, as a result of mental illness, a danger to others or to himself or gravely disabled. *See Curnow,* 676 P.2d at 1182.

> [T]he statutory procedure [described in section 27–10–107] brings both the educated opinion of the expert and the common sense judgment of the judge or jury to bear on whether short-term involuntary treatment is necessary. This procedure, involving a mixture of medical and social or legal judgments, was obviously adopted to put a check on the discretion of the professionals responsible for deciding whether certification is justified. *See Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

*Taylor,* 618 P.2d at 1133. Once a determination is made that a patient's mental illness "renders him *potentially dangerous,*" the state may exercise its police power over the patient in ordering his involuntary commitment. *People v. Lane,* 196 Colo. 42, 45, 581 P.2d 719, 721 (1978) (emphasis added).

The term "dangerous" in section 16–8–120(1), 8A C.R.S. (1986),[2] relating to conditional release from the department of institutions, has been found not to be unconstitutionally vague because persons of common intelligence can readily understand its

meaning and application. *See Howell,* 196 Colo. at 412, 586 P.2d at 30; *see also Glatz v. Kort,* 807 F.2d 1514, 1522 (10th Cir.1986) (imprecision in forecasting potential for dangerousness does not render section 16–8–120 unconstitutionally vague). The meaning of "danger" is equally comprehensible in the civil commitment context, so it does not offend due process for that reason.

Stevens nevertheless argues that the term "danger" in sections 27–10–107, –109, and –111 offends due process by creating a danger of arbitrary enforcement. She argues that the term fails to set precise standards for determining when a patient's potential for doing harm to self or others is great enough to justify the massive curtailment of liberty inherent in involuntary commitment.

### 1.

Colorado is one of a handful of states that has not qualified or further defined the degree of dangerousness required for involuntary commitment.[3] The remaining states have chosen to define the degree of dangerousness in terms of a risk of harm to self or others. This risk has been alternately described as a substantial risk,[4] a

---

**2.** Section 16–8–120(1) provides:

> As to any person charged with any crime allegedly committed on or after June 2, 1965, the test for determination of a defendant's sanity for release from commitment, or his eligibility for conditional release, shall be: "That the defendant has no abnormal mental condition which would be likely to cause him to be dangerous either to himself or to others or to the community in the reasonably foreseeable future."

**3.** In addition to Colorado, Maryland, Oregon, and Vermont have not specified the degree of dangerousness required for involuntary commitment by statute or judicial interpretation. *See* Md.Health–Gen.Code Ann. §§ 10–617, –805(f) (1982 & Supp.1987); Or.Rev.Stat. § 426.005(2)(a) (1987); Vt.Stat.Ann. tit. 18, § 7101(17) (1987).

The Kansas legislature amended its civil commitment statute in 1987 to require proof that the person sought to be committed is "likely" to be dangerous to self or others. *See* Kan.Stat. Ann. § 59–2902(g), (h) (Supp.1987). Also, the New Jersey Supreme Court in 1983 construed its civil commitment statute to require proof that the person sought to be committed is "like-

ly" to be dangerous to self or others. *See Matter of S.L.,* 94 N.J. 128, 462 A.2d 1252 (1983).

**4.** Alaska Stat. § 47.30.915(10) (1984); Ark.Stat. Ann. § 20–47–202(1), (2) (1987) (significant or substantial risk); Cal.Welf. & Inst.Code §§ 5300, 5300.5 (West 1984) (presents a demonstrated danger); Conn.Gen.Stat. § 17–176 (1987); Fla. Stat.Ann. § 394.467(2)(b) (West 1986); Ga.Code Ann. § 37–3–1(9.1)(A)(i) (Supp.1988); Idaho Code § 66–317(*l*) (Supp.1988); Ind.Code Ann. § 16–14–9.1–1(c) (West Supp.1988); Ky.Rev. Stat.Ann. § 202A.011(2) (Michie/Bobbs–Merrill 1982); Me.Rev.Stat.Ann. tit. 34–B, § 3801.4 (1988); Mass.Gen.L. ch. 123, §§ 1, 8(b) (1986); Minn.Stat. § 253B.02 Subd. 13 (1986) (poses a substantial likelihood of harm); Miss.Code Ann. § 41–21–61(e) (Supp.1987); Mo.Rev.Stat. § 632.005(9) (1988); Neb.Rev.Stat. § 83–1009 (1987); N.Y.Mental Hyg.Law § 9.37(a) (McKinney 1978 & Supp.1986); N.C.Gen.Stat. § 122C–3(11) (1986); N.D.Cent.Code Ann. § 25–03.1–02(11)(b) (Supp.1987) (substantial likelihood of harm); Ohio Rev.Code Ann. § 5122.01(B) (Anderson 1981); R.I.Gen.Laws § 40.1–5–2(14) (1984); Tenn.Code Ann. § 33–6–103(a)(2) (1984); Wash.Rev.Code § 71.05.020(3) (1987); W.Va.Code § 27–1–12

clear and present threat,[5] likely,[6] a reasonable expectation,[7] and an imminent threat.[8] Many states impose the additional requirement that the state prove that the patient had committed a recent overt act of violence to himself or others.[9]

■ There is no requirement, however, that due process of law must be the same in all fifty states. *People ex rel. Juhan v. District Court*, 165 Colo. 253, 260–61, 439 P.2d 741, 745 (1968).

The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold. As the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum.

*Addington*, 441 U.S. at 431, 99 S.Ct. at 1812. In holding that the word "dangerous" in section 16–8–120(1) satisfies due process, we stated:

[T]hat the determination of dangerousness involves a prediction of the appellant's future conduct rather than mere

(1986) (substantial tendency to harm); Wis.Stat. § 51.20(1)(a)(2) (1987) (substantial probability of physical harm).

5. Ala.Code § 22–52–10 (1984) (real and present threat of substantial harm); Del.Code Ann. tit. 16, § 5001(1) (1983); Minn.Stat. § 253B.02 Subd. 17 (1986) (presents a clear danger); Nev. Rev.Stat.Ann. § 433A.145 (Michie 1986) (has demonstrated observable behavior the consequences of which present a clear and present danger); 50 Pa.Cons.Stat.Ann. § 7301 (Purdon 1986).

6. D.C.Code Ann. § 21–545(b) (Supp.1986); Iowa Code § 229.1(2) (1987); Kan.Stat.Ann. § 59–2902(g), (h) (Supp.1987); N.H.Rev.Stat. Ann. § 135–B:26 (1977) (creates potentially serious likelihood of danger); N.J.Rev.Stat. § 30:4–23 (1981 & Supp.1988) ("requires care and treatment" judicially interpreted in *Matter of S.L.*, 94 N.J. 128, 462 A.2d 1252 (1983), to require proof that person is likely to pose danger); N.M.Stat.Ann. § 43–1–3(L) (1984) ("more likely than not that in the near future" person will cause harm); S.C.Code Ann. § 44–17–580(2) (Law.Co-op 1985); Tex.Rev.Civ.Stat.Ann. art. 5547–50(b)(2) (Vernon Supp.1988).

7. Ariz.Rev.Stat.Ann. § 36–501 (1986 & Supp. 1987) (can reasonably be expected to result in physical harm); Ill.Rev.Stat. ch. 91½, para. 1–119(1) (1987) (is reasonably expected to inflict serious physical harm in the near future); La. Rev.Stat.Ann. § 28:2(3) (West Supp.1988) (reasonable expectation of substantial risk of physical harm); Mich.Comp.Laws § 330.1401(a) (Supp.1986) (can reasonably be expected within near future to cause serious injury); Okla.Stat. Ann. tit. 43A, § 1–103(n)(1) (West Supp.1988) (can be expected within near future to cause serious physical injury); S.D.Codified Laws Ann. § 27A–1–2(4) (Supp.1988) (is reasonably expected in near future to inflict substantial physical injury); Utah Code Ann. § 64–7–36(3) (1987) (reasonable basis to believe patient's condition and immediate danger to self or others requires involuntary hospitalization).

8. Haw.Rev.Stat. § 334–60.2 (1985) (imminently dangerous); Mont.Code Ann. § 53–21–102(14) (1987) (injury or imminent threat thereof); Va. Code Ann. § 37.1–67.3 (Supp.1988) (imminent danger); Wyo.Stat. § 25–10–101(a)(viii) (1982) (imminent threat).

9. *See, e.g.,* Ala.Code § 22–52–10(a)(3) (1984); Alaska Stat. § 47.30.915(10) (1984); Ark.Stat. Ann. § 20–47–202 (1987); Cal.Welf. & Inst.Code § 5300 (West 1984); Del.Code Ann. tit. 16, § 5001(1)(i) (1983); Fla.Stat. § 394.467(1)2.a (West 1986); Me.Rev.Stat.Ann. tit. 34–B, § 3864(6)(A) (1988); Minn.Stat. § 253B.02 Subd. 17 (1986); Miss.Code Ann. § 41–21–61(e) (Supp.1987); Mo.Rev.Stat. § 632.005(9) (1988); Mont.Code Ann. § 53–21–126(2) (1987); Neb. Rev.Stat. § 83–1009 (1987); Ohio Rev.Code Ann. § 5122.01(B) (Anderson 1981); 50 Pa.Const.Stat. § 7301(b) (Supp.1986); S.D.Codified Laws Ann. § 27A–1–2(4) (Supp.1988); Tex.Rev.Civ.Stat. Ann. art. 5547–51(c) (Vernon Supp.1988); Wash.Rev.Code § 71.05.020(3) (1987); Wis.Stat. § 51.20 (Supp.1986); *see also Suzuki v. Yuen*, 617 F.2d 173 (9th Cir.1980); *Stamus v. Leonhardt*, 414 F.Supp. 439 (S.D.Iowa 1976); *Doremus v. Farrell*, 407 F.Supp. 509 (D.Neb.1975); *Lynch v. Baxley*, 386 F.Supp. 378, 391 (M.D.Ala. 1974); *Welsh v. Likins*, 373 F.Supp. 487 (D.Minn.1974); *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972), *vacated and remanded for more specific order*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *order on remand*, 379 F.Supp. 1376 (E.D.Wis.), *vacated and remanded on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *order reinstated on remand*, 413 F.Supp. 1318 (E.D.Wis.1976). *But see, e.g., Project Release v. Prevost*, 722 F.2d 960, 973–74 (2d Cir.1983); *Colyar v. Third Judicial District Court*, 469 F.Supp. 424, 434 (D.Utah 1979); *United States ex rel. Mathew v. Nelson*, 461 F.Supp. 707, 710 (N.D.Ill.1978); *Appeal in Pima County Mental Health Case No. MH 1717-1-85*, 149 Ariz. 594, 595, 721 P.2d 142, 143 (Ariz.App.1986); *Commonwealth v. Nassar*, 406 N.E.2d 1286, 1288 (Mass.1980); *In re Slabaugh*, 16 Ohio App. 3d 255, 257–58, 475 N.E.2d 497, 500 (1984); *In re Harris*, 98 Wash.2d 276, 284–85, 654 P.2d 109, 113 (1982).

characterization of his past conduct does not violate due process. A required finding is the likelihood of dangerous conduct in terms of probability, not mere possibility. Due process does not require certainty of prediction, for that cannot realistically be expected.

*Howell*, 196 Colo. at 412, 586 P.2d at 30 (citation omitted).

Unlike section 16–8–120(1), section 27–10–107 does not require a patient's dangerousness to be "likely" to occur. Because a finding of dangerousness must be couched in terms of probability rather than mere possibility, we conclude that some qualification to the word "danger" in sections 27–10–107, –109, and –111 is necessary to comport with due process.

2.

■ From the statutory scheme of involuntary commitment, it is clear that the evaluation of a person's potential for doing harm must be made as of the time of each certification for short-term care or long-term care and treatment. *See* §§ 27–10–107(1), –109(1), –111(1). This requires a finding of present danger to self or others. In addition, there must be a reasonable basis to believe that the patient is dangerous, as shown by expert medical opinion and other clear and convincing evidence. *See* §§ 27–10–107(1)(a), –109(1)(a), –111(1)(a).

■ Concepts of probability and reasonableness are integral ingredients of any objective measure of conduct. *Randall*, 711 P.2d at 692. As the Supreme Court of Vermont stated:

> The Vermont statute [10] requires evidence that the proposed patient presents *a present danger* of harm to himself or others, as evidenced by threats or behavior. This showing must satisfy the clear and convincing standard of proof, and must be made at a hearing at which the proposed patient is represented by counsel, and at which the rules of evidence apply. Where the State proves, clearly and convincingly, that the proposed patient's threats or acts demonstrate that he is a danger to himself, due process concerns are served.

*In re L.R.*, 146 Vt. 17, 21, 497 A.2d 753, 756 (1985) (emphasis added); *see also In re Gatson*, 3 Kan.App.2d 265, 267–68, 593 P.2d 423, 426 (1979) (due process satisfied by finding of present dangerousness and mental impairment). We therefore hold that the dangerousness requirement of sections 27–10–107, –109 and –111 satisfies the demands of due process so long as the state proves by clear and convincing evidence that there is a reasonable basis to believe that the individual's mental illness results in a present danger to herself or others, or renders her gravely disabled. This standard is adequate to justify the massive curtailment of liberty inherent in involuntary commitment.

**10.** A "person in need of treatment" at the time of admission can be hospitalized to receive involuntary care and treatment. Vt.Stat.Ann. tit. 18, § 7617(b) (Supp.1985). A "person in need of treatment" is defined as

a person who is suffering from mental illness and, as a result of that mental illness, his capacity to exercise self-control, judgment, or discretion in the conduct of his affairs and social relations is so lessened that he poses a danger of harm to himself or others;

(A) A danger of harm to others may be shown by establishing that:

(i) he has inflicted or attempted to inflict bodily harm on another; or

(ii) by his threats or actions he has placed others in reasonable fear of physical harm to themselves; or

(iii) by his actions or inactions he has presented a danger to persons in his care.

(B) A danger of harm to himself may be shown by establishing that:

(i) he has threatened or attempted suicide or serious bodily harm; or

(ii) he has behaved in such a manner as to indicate that he is unable, without supervision and the assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, so that it is probable that death, substantial physical bodily injury, serious mental deterioration or serious physical debilitation or disease will ensue unless adequate treatment is afforded.

Vt.Stat.Ann. tit. 18, § 7101(17) (1987). Dangerousness under the Vermont statute is shown in substantially the same manner as it is in Colorado. In Colorado, dangerousness can be shown by evidence of injurious acts, attempts or threats. *See Taylor*, 618 P.2d at 1137.

## B.

■ Stevens argues that, even if the statute is not vague on its face, it is vague as applied to her. We do not agree.

Three medical experts testified at Stevens' certification hearing. Based on hospital records, the police report, and their interviews with her, all three agreed that Stevens was mentally ill. Dr. Fairchild, the certifying psychologist, believed she was "potentially dangerous" to herself. He described her personality disorder as typically associated with dangerous behavior. Although Stevens had not assaulted anyone or behaved aggressively since being hospitalized, he said she had experienced rapid mood swings, fixation on revenge fantasies, denial of mental illness and need for treatment, and feelings of victimization. He believed Stevens' purchase and public brandishing of a gun indicated that "dangerousness is still very much a high risk with Miss Stevens."

Dr. Smyrl, the psychiatrist assigned to her case, believed she was as dangerous to herself as to others. Behavior indicating dangerousness included purchasing a gun impulsively;[11] showing the gun to strangers; overreacting to police officers; making a phone call to the governor claiming she had been forced to take medication and had been denied an attorney; making a phone call to her parents claiming the hospital staff had put poison or drugs in her food; and dressing inappropriately and responding inappropriately while watching television.[12] He said that, as long as she refused treatment, she would continue to pose "a significant risk" of danger; and that the risk was "very high" that she would be unable to cope with everyday stress if left untreated.

Dr. Leavitt, a court-appointed psychiatrist, believed Stevens was more dangerous to herself than to others. He testified that Stevens was "potentially dangerous" but not "imminently dangerous." This opinion was based partially on the report that, on two occasions, Stevens had been threatened or assaulted by another patient and that, rather than acting aggressively, she merely subdued the patient until a staff member appeared. He concluded that she would require involuntary treatment as long as she refused treatment and continued to believe she bore no responsibility for the events that had happened to her.

This evidence is sufficient to indicate by clear and convincing evidence that there is a reasonable basis to believe Stevens' mental illness resulted in a present danger to herself or others, thereby satisfying the prerequisite conditions for short-term certification pursuant to section 27–10–107.

## III.

Stevens argues that due process and section 27–10–101(1)(b) require the state to determine that no less restrictive alternative is available[13] as a condition precedent to certification a patient for short-term treatment. The state argues that the present statutory scheme adequately protects the due process rights of the individual, and that the additional consideration of less restrictive alternatives is not only not more likely to lower the risk of an errone-

---

**11.** Stevens contends her decision to purchase the gun was not impulsive. Instead, she appears to claim, she bought the gun because she had been raped three months before she was hospitalized and because a stranger had assaulted her on a bus a week before she was hospitalized. The record is unclear because Stevens did not testify in her behalf.

**12.** According to hospital reports made two days before the hearing, Stevens wore her hospital gown backwards, so that the lower part of her body was not properly covered and later posed provocatively in front of a mirror in the day room in a tight-fitting leotard. She also cheered the announcement of the American bombing of

Libya, stating she was likely to be called to fight as "a member of the reserves."

**13.** The psychiatrists agree that two factors causing stress to Stevens were lack of income sufficient to pay her bills and proximity to persons she believed were responsible for her military discharge. One of the psychiatrists testified that one alternative to involuntary confinement was to release her into the custody of her parents and permit her to return with them to Mississippi. This possibility appears to be more of an offhand comment than a viable alternative, but the record does not reveal that the trial court considered and rejected any less restrictive alternatives to involuntary commitment.

ous deprivation of liberty but would also impose significant fiscal burdens on the government.

 Under the present statutory scheme, a person certified for short-term treatment or long-term care and treatment is entitled to demand treatment in a less restrictive setting or to demand release from the treating facility pursuant to the provisions of section 13–45–102, 6A C.R.S. (1987). Less restrictive alternatives, however, need not be considered as a condition precedent to certification. Instead, the patient must demand a hearing and bears the burden of proving by a preponderance of the evidence that a less restrictive alternative is available. *See* § 27–10–116(1)(b), 11 C.R.S. (1987 Supp.). Under Stevens' proposal, the state would bear the burden of proving by clear and convincing evidence that no less restrictive alternative is available as a condition precedent to certification. We conclude that the present statutory scheme adequately protects against the risk of erroneous deprivation and safeguards the due process rights of the mentally ill.

Many states require proof that no less restrictive alternative is available as a condition precedent to involuntary commitment.[14] Section 27–10–101, 11 C.R.S. (1982 & 1987 Supp.), provides in pertinent part:

> (1) The general assembly hereby declares that, subject to available appropriations, the purposes of this article are:
>
> . . . .

> (b) To deprive a person of his liberty for purposes of treatment or care *only when less restrictive alternatives are unavailable* and only when his safety or the safety of others is endangered;
>
> . . . .

> (2) To carry out these purposes, the provisions of this article shall be liberally construed.

(Emphasis added.) The entire tenor of the civil commitment statutes is to recognize and protect the dignity and legal rights of patients treated pursuant to its provisions. *Goedecke v. Department of Inst.,* 198 Colo. 407, 410, 603 P.2d 123, 125 (1979).

Questions of denial of procedural due process require a two-part analysis: first, whether a protected interest in life, liberty, or property is implicated; and second, assuming a protected interest is implicated, what process is due. *People v. Chavez,* 629 P.2d 1040 (Colo.1981). In determining what process is due, three factors must be considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (citation

---

**14.** *See, e.g.,* Ala.Code § 22–52–10(a)(5) (1984); Ariz.Rev.Stat.Ann. § 36–540(B) (1986); Ark.Stat. Ann. § 20–47–219(a) (1987); Conn.Gen.Stat. § 17–178(c) (1987); Del.Code Ann. tit. 16, § 5010(2) (1987); D.C.Code Ann. § 21–545(b) (Supp.1986); Fla.Stat. § 394.467(1)(b) (West 1986); Ga.Code Ann. § 37–3–1(9.1)(A)(i) (Supp. 1988); Haw.Rev.Stat. § 334–60.2(3) (1985); Kan.Stat.Ann. § 59–2914(a) (Supp.1987); La. Rev.Stat.Ann. § 28:55(E) (Supp.1988); Me.Rev. Stat.Ann. tit. 34–B, § 3864 Subd. 5E(2) (1988); Md.Health–Gen.Code Ann. § 10–617(a)(5) (1982 & Supp.1987); Minn.Stat. § 253B.09 Subd. 1 (1986); Miss.Code Ann. § 41–21–73(4) (Supp. 1987); Mo.Rev.Stat.Ann. §§ 630.005 Subd. 1(18), .615(2) (1988); Mont.Code Ann. § 53–21–120 (1987), (temporary until July 1, 1989); Neb.Rev.Stat. § 83–1036 (1987); Nev. Rev.Stat.Ann. § 433A.310(3) (Michie 1986); N.D.Cent.Code Ann. § 25–03.1–17 (Supp.1987); N.H.Rev.Stat.Ann. § 135–B:37 (1977); N.J.Stat. Ann. § 30:4–24.2(d)(3) (1981 & 1988); N.M.Stat. Ann. § 43–1–11(C)(3) (1984); Okla.Stat.Ann. tit. 43A, § 4–102(5) (West Supp.1988); R.I.Gen. Laws § 40.1–5–8(10) (1984); Tenn.Code Ann. § 33–6–103(c)(4) (1984); Utah Code Ann. § 64–7–36(10)(d) (1987); Va.Code § 37.1–67.3 (Supp.1988); Vt.Stat.Ann. tit. 18, § 7617(c) (1987); Wash.Rev.Code § 71.05.230(4) (1987); W.Va.Code § 27–5–3(a) (1986). *See generally* Hoffman & Foust, *Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Senses,* 14 San Diego L.Rev. 1100 (1977); Note, *The Due Process of Community Treatment of the Mentally Ill: A Case Study,* 59 Tex.L.Rev. 1481, 1490 & n. 52 (1981).

omitted); *In re P.F. v. Walsh,* 648 P.2d 1067, 1070–71 (Colo.1982).

■ Civil commitment constitutes a severe infringement of liberty, requiring due process protection, thereby triggering analysis under the three-part *Mathews* test. *Curnow,* 676 P.2d at 1183. The private interest affected by civil commitment is both real and substantial. Likewise, the government's interest in protecting society against mentally ill persons who are dangerous or gravely disabled is uncontested.

> The determinative factors in this case, therefore, are the second—whether the risk of an erroneous deprivation of liberty will be lessened by requiring a mandatory probable cause hearing prior to a short-term certification and the probable value, if any, of the additional procedural safeguards—and a portion of the third factor, the fiscal and administrative burdens that the additional procedure would entail for the government.

*Id.*

■ The risk of error in any civil commitment decision is substantial. "Subjective judgment is necessarily involved in an evaluation of mental illness and 'there can be little responsible debate regarding "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." ' " *Brown v. Jensen,* 572 F.Supp. 193, 198 (D.Colo.1983) (quoting *O'Connor,* 422 U.S. at 584, 95 S.Ct. at 2498 (Burger, C.J., concurring) (quoting *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956))). The present statutory scheme, however, contains a number of procedural safeguards that greatly reduce this inherent risk of erroneous deprivation.

> These include a professional decision to initiate the seventy-two hour evaluation; professional medical evaluation at the time of involuntary short-term commitment; certification signed by a professional medical evaluator and filed with the court; notice concerning certification

within twenty-four hours to the person committed; notice concerning certification to one other person [whom] the respondent designates; forthwith appointment of an attorney to represent the respondent; a hearing within ten days if requested by the respondent or his attorney; the burden of proof by clear and convincing evidence upon the person or facility seeking to detain the respondent; and optional court appointment of an independent professional person to examine the respondent.

*Curnow,* 676 P.2d at 1185.

In addition, the present statutory scheme requires the state to prove that the person to be committed either has refused voluntary treatment after being advised of its availability, or has accepted voluntary treatment when reasonable grounds exist to believe the person will not comply with the terms of the treatment. *See* §§ 27–10–107(1)(b), –109(1)(b), –111(1). Also, a person certified for care and treatment may petition the court for release to a less restrictive setting or release from the treating facility when adequate medical and psychiatric care and treatment is not administered. *See* § 27–10–116(1)(b). Finally, a person certified for short-term care has the opportunity to demand a hearing should short-term care be extended, *see* § 27–10–108, and a person certified for long-term care and treatment is required to receive a hearing, *see* § 27–10–109(2).

Due process does not require a mandatory hearing at the time of certification so long as the statute already provides for a hearing on request. *See Brown,* 572 F.Supp. at 198–99 (construing § 27–10–107); *Curnow,* 676 P.2d at 1185–86 (construing § 27–10–107). We likewise conclude that the existence of sections 27–10–116(1)(b), –107(1)(b), –109(1)(b), and –111(1) obviates the need for a finding that no less restrictive alternative is available as a condition precedent to certification.[15]

**15.** Further inquiry concerning the extent to which a finding prior to certification that no less restrictive alternatives are available might decrease the chance of error in predicting dangerousness "may be better explored in the legis-

lative forum." *Project Release,* 722 F.2d at 974 (citation omitted).

Regardless of the constitutional place of such a doctrine, either in general or in the particular context, we think it natural and right that

For these reasons, we hold that the present statutory scheme comports with due process of law.

The order of the district court is affirmed.

all concerned in the law and its administration should strive to find the least burdensome or oppressive controls over the individual that are compatible with the fulfilment of the dual purposes of our statute, namely, protection of the person and others from physical harm and rehabilitation of the person. *Nassar*, 406 N.E.2d at 1291.