**Becky S. MOORE, Plaintiff,**

v.

**WYOMING MEDICAL CENTER, a Wyoming corporation, Timothy Francis Weaver, an individual, and Michael Hendershot, an individual, Defendants.**

No. 92–CV–1037–B.

United States District Court, D. Wyoming.

July 1, 1993.

Robert G. Pickering, Bailey, Pickering & Stock, Cheyenne, WY, for plaintiff.

Hampton K. O'Neill, Roger E. Shumate, Murane & Bostwick, Casper, WY, for defendants.

### ORDER DENYING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS EXCEPT PLAINTIFF'S CIVIL CONSPIRACY CAUSE OF ACTION

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon the defendants' motion for summary judgment and plaintiff's motion in opposition thereto, and the Court having reviewed the materials on file herein, having heard argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

#### Background

Plaintiff Becky Moore ("Moore") is a thirty-one year old person with a history of mental illness. On the afternoon of December 5, 1989, Moore called the Central Wyoming Counseling Center to request medication to help her sleep. Moore's physician, Doctor Robert D. Brown, had prescribed Mellaril for Moore's condition.[1] Mellaril is a drug often prescribed for schizophrenics and manic-depressives.[2] When Moore called, neither Dr. Brown nor Moore's therapist, Ms.

---

1. Mellaril (or "Melaril") is the trademark name for the drug thioridazine hydrochloride. DOHRLAND'S ILLUSTRATED MEDICAL DICTIONARY 929 (25th ed. 1965).

2. ROSCOE N. GRAY, M.D. & LOUISE J. GORDY, M.D., LL.B., ATTORNEYS TEXTBOOK OF MEDICINE Vol. 3B, ¶¶ 103.13(1), (1a), (1b) and (1c) (3d ed. 1992).

Susan Crabtree, were available. That evening, Ms. Crabtree returned Moore's call. The conversation is disputed. Moore testified that she told Crabtree that "if I am unable to get some sleep, my body is going to shut down." Crabtree testified in her deposition that Moore stated, "If I don't get some sleep, I'm going to kill myself."

Crabtree believed that Moore intended to commit suicide based on this conversation. Crabtree called to alert the Casper Police and the Wyoming Medical Center, both of whom dispatched personnel to Moore's home as a result. Marla Ross, a co-worker of Moore's, arrived at Moore's home around the same time the police arrived. Ross went upstairs to find Moore showering in her bathroom. Ross asked Moore if she could enter, but Moore said no. The Casper police spoke with Ross and told Ross that they understood that Moore was suicidal. Ross apparently denied this. Ross and the police further consulted, jointly deciding that Ross should try again to enter the bathroom. All the while, Moore was unaware the police were present in her home.

Co-worker Ross successfully entered the bathroom and spoke with Moore. Moore reacted angrily, but then calmed down. Ross subsequently exited the bathroom and informed the police that Moore appeared calm. Ross testified in her deposition that one of the police officers told her that "It looks like you've got it under control. She sounds so much better now." Ross re-entered the bathroom to urge Moore to dress (since Ross knew the police were outside, but Moore did not). Moore directed Ross to get her a blanket from Moore's bedroom closet. Ross exited the bathroom a second time to procure the blanket.

While Ross sought a blanket, firemen and defendant-paramedics Timothy Weaver ("Weaver") and Michael Hendershot ("Hendershot") arrived at the house. Hendershot questioned the police officers on the scene. Hendershot testified in his deposition that one of the officers told him that "things were quiet right now."

Hendershot, Weaver and two others proceeded to the top landing outside Moore's bathroom door. At this point, Hendershot radioed the Wyoming Medical Center and advised that all was quiet. Dr. Ronald D. Iverson, the supervising physician at the medical center, apparently ordered Hendershot to bring Moore to Wyoming Medical Center even if she had to be brought against her wishes. A transcript of this radio conversation indicates that Dr. Iverson wanted Moore brought to Wyoming Medical Center immediately because she was taking Mellaril and also told Crabtree that she would kill herself if she didn't get some sleep.

Ross returned to the top of the stairs with the blanket requested by Moore. Ross asked the two paramedics if she might deliver the blanket before they entered the bathroom. One of the men allegedly pushed Ross back and stated, "if we need your help, we'll ask for it."

Hendershot then tapped on the bathroom door and identified himself. Moore responded that she did not want anyone to come in. The paramedics advised Moore that she should accompany them to the hospital. Moore said she did not want to go and threw a shampoo bottle at the men. Weaver and Hendershot entered the bathroom, grabbed Moore, forced her to the floor and handcuffed her. At the time Moore was naked. Moore requested that the men clothe her. One of the men apparently told her, "You don't have a choice."

Weaver and Hendershot put Moore in a horizontal position and carried her outside to the ambulance. Neighbors had gathered outside Moore's home to observe the commotion. On the way to the medical center, the paramedics were unable to perform any of the standard procedures typically required for drug-overdose patients including taking vital signs, checking respiration and circulation. Moore was involuntarily admitted to the emergency room at Wyoming Medical Center.

Plaintiff Moore complains that the defendants detained her without adequate or proper investigation, without authority or probable cause, and ignored her repeated pleas to cover her body prior to being transported. Moore further complains that the defendants did not inform her of her rights nor did they

complete the required forms in support of her detention, all pursuant to Wyoming's Emergency Detention Statute, Section 25–10–101, *et seq.* Plaintiff brought this suit under section 1983, also alleging various common law torts.

### Standard of Review

"By its very terms, [the Rule 56(c) ] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

■ The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510; *see also Carey v. United States Postal Service*, 812 F.2d 621, 623 (10th Cir.1987). Summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Carey*, 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey*, 812 F.2d at 623. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981).

### Discussion

The Court divides its analysis into four sections: (1) whether Wyoming Statute § 25–10–109 is constitutional; (2) whether the defendant Wyoming Medical Center act-ed under color of state law; (3) whether the defendants may assert the defenses of qualified immunity or municipal immunity; and, (4) state law claims.

### 1. Whether Wyoming Statute § 25–10–109 is constitutional.

■ Wyoming's Emergency Detention statute, Section 25–10–109, provides that a person may be detained by a law enforcement officer or a medical examiner where that officer or examiner has reasonable cause to believe the person is mentally ill. Wyo. Stat. § 25–10–109(a) (Michie's 1990).[3] The statute defines a mentally ill person as one who has a physical, emotional, mental or behavioral disorder which causes him or her to be dangerous to him or herself or others, and which requires treatment. Wyo.Stat. § 25–10–101(ix).

The phrase "dangerous to himself or others" is defined as follows:

(ii) "Dangerous to himself or others" means that, as a result of mental illness, a person:

(A) Evidences a substantial probability of physical harm to himself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm; or

(B) Evidences a substantial probability of physical harm to other individuals as manifested by a recent overt homicidal act, attempt or threat or other violent act, attempt or threat which places others in reasonable fear of serious physical harm to them; or

(C) Evidences behavior manifested by recent acts or omissions that, due to mental illness, he is unable to satisfy basic needs for nourishment, essential medical care, shelter or safety so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue, unless the individual receives prompt and adequate treatment for the mental illness. No person, however, shall be deemed to be unable to satisfy his need for nourishment, essential medical care,

---

**3.** All cites to Wyoming State statutes refer to Michie's 1990 version unless otherwise noted.

shelter or safety if he is able to satisfy those needs with the supervision and assistance of others who are willing and available.

Wyo.Stat. § 25–10–101(ii).

A medical examiner must examine the detainee within twenty-four hours after he or she is detained, otherwise the detainee must be released. Wyo.Stat. § 25–10–109(b). The detained person may be held for up to seventy-two hours if the examiner determines that he or she is mentally ill and dangerous as defined under Section 25–10–101(ii). The detainee should be hospitalized at a "suitable" medical facility. Wyo.Stat. § 25–10–109(d). The officer or examiner who initially detained the allegedly mentally ill person must write a statement of the facts surrounding the emergency detention, and the detainee must get a copy of that statement. Wyo.Stat. § 25–10–109(e). The detained person may be treated against his or her will only when such treatment is necessary to prevent immediate and serious physical harm to the detainee or others. Wyo. Stat. § 25–10–109(f). The detainee must be advised regarding the scope of treatment he or she receives, his or her right to contact family and an attorney, and his or her right to remain silent. Wyo.Stat. §§ 25–10–109(f) and (g). Finally, a court must conduct a hearing within seventy-two hours of the detainee being detained when "an application for involuntary hospitalization is filed." Wyo. Stat. § 25–10–109(h), (j) and (k).

Prior to July 1, 1989, the statute defined a mentally ill person as:

> [A] person who presents an *imminent threat of physical harm to himself or others* as a result of a physical, emotional, mental or behavioral disorder which grossly impairs his ability to function socially, vocationally, or interpersonally and who needs treatment and who cannot comprehend the need for or purposes of treatment and with respect to who[m] the potential risk and benefits are such that a reasonable person would consent to treatment[.]

Wyo.Stat. § 25–10–101(viii) (Michie's 1989) (italics added).

Plaintiff Moore contends that the amended statute infringes her liberty interest because the definition of "dangerous to himself or others"—incorporated in the amended definition of "mentally ill"—deletes the "imminent" requirement articulated in the pre-July 1, 1989 statute. In other words, the plaintiff urges that the "dangerousness" standard for suicidal acts, as articulated in Section 25–10–101(ii)(A), is too broad and therefore infringes her liberty interest. By contrast, the defendants contend that the meaning of the amended statutory language is effectively the same as the old statute and, therefore, the amended language cannot infringe on the plaintiff's liberty interest.

■■■ Generally, state statutes are presumed constitutional and the party challenging the statute must demonstrate "beyond a reasonable doubt" that the statute is unconstitutional. *See Eaton v. Jarvis Prods. Corp.,* 965 F.2d 922, 929 (10th Cir.1992); *Brecheisen v. Mondragon,* 833 F.2d 238, 241 (10th Cir.1987). In construing a state statute, the court assumes that the legislature expressed its purpose through the ordinary meaning of the words used. *Immigration and Naturalization Serv. v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992). The court reads the statute as a whole, endeavoring to best effect legislative intent. *In re LaBelle,* 728 P.2d 138, 145 (Wash.1986); *Kirby Bldg. Sys. v. Mineral Exploration Cos.,* 704 P.2d 1266, 1280 (Wyo.1985).

The Court's constitutional analysis must also consider that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Bee v. Greaves,* 744 F.2d 1387, 1393 (10th Cir.1984) (citing *Youngberg v. Romero,* 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982)). Courts have recognized that involuntary civil commitment severely infringes on a person's right to be free from governmental restraint because it affects one's right not to be confined unnecessarily. *See, e.g., Parham v. J.R.,* 442 U.S. 584, 600, 626, 99 S.Ct. 2493, 2503, 2516, 61 L.Ed.2d 101 (1979); *Milonas v. Williams,* 691 F.2d 931, 943 (10th Cir.1982).

Despite the acknowledged importance of a plaintiff's liberty interest, it is not clear whether state statutes authorizing emergency detention of the mentally ill receive strict scrutiny or a rational basis analysis. *See Foucha v. Louisiana,* —— U.S. ——, —— n. 12, ——–——, 112 S.Ct. 1780, 1805 n. 12, 1806–07, 118 L.Ed.2d 437 (1992) (Thomas, J., dissenting) (arguing that the Court has never applied strict scrutiny to state laws involving involuntary civil confinement). Some courts have invoked less restrictive alternatives analysis in related contexts which suggests the use of strict scrutiny. *See, e.g., Lynch v. Baxley,* 744 F.2d 1452, 1458–59, 1459 n. 11 (11th Cir.1984) (in the context of temporary jail detention, government may not pursue a legitimate purpose which broadly stifles fundamental liberties where that purpose may be more narrowly achieved); *People v. Stevens,* 761 P.2d 768, 776, 776 n. 14 (Colo.1988) (court lists statutes which require proof that a lesser restrictive alternative is not available prior to involuntary commitment). Other courts have stated that involuntary commitment statutes merit "close scrutiny" or must be "construed strictly" because they authorize severe deprivations of liberty. *See, e.g., In re LaBelle,* 728 P.2d at 145; *Doe v. Gallinot,* 486 F.Supp. 983, 992 (C.D.Cal.1979). In any event, a detainee's liberty interest is not absolute. A court must balance the detainee's interest against competing state interests to determine whether that interest is outweighed by the "demands of an organized society." *Bee,* 744 F.2d at 1394; *see also, In re LaBelle,* 728 P.2d at 153.

Neither party at bar argues that the state of Wyoming does not have a compelling interest in temporarily detaining and treating a mentally ill person who is dangerous. *See, e.g., Lynch v. Baxley,* 744 F.2d at 1458, 1458 n. 10. Plaintiff, however, disputes the means employed by the statute regarding attempted or threatened suicides, namely that the statute utilizes a "substantial probability of harm" standard instead of an "imminent threat of physical harm" standard.

The Court finds on point the case of *People v. Stevens,* 761 P.2d 768 (Colo.1988). The detainee in *Stevens* challenged a portion of Colorado's Emergency Detention statute which did not define the degree of dangerousness required to detain a mentally ill individual. *Id.* at 772. The *Stevens* court acknowledged the substantial liberty interests at stake. *Id.* at 771. It then reasoned, *inter alia,* that "[t]here is no requirement . . . that due process of law must be the same in all fifty states" since federalism dictates that states may develop a "variety of solutions" to a given societal problem. Procedures may vary by state so long as they "meet the constitutional minimum." *Id.* at 773 (citing *Addington v. Texas,* 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979)). The *Stevens* court noted that different state statutes describe the risk of harm differently, including such standards as "a substantial risk," "a clear and present threat," "likely," "a reasonable expectation" and "an imminent threat." *Id.* at 772–73. (footnotes omitted). The *Stevens* court concluded that "some qualification to the word 'danger[ous]' . . . is necessary to [make the Colorado statute] comport with due process," though the court held that the Colorado statutory scheme as a whole was constitutional. *Id.* at 774, 778.

By comparison, section 25–10–101(ii)(A) in the Wyoming statute defines "dangerous," in relevant part, as "a substantial probability of physical harm to himself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." As it stands, the Wyoming statute provides more detail with regard to what constitutes "dangerousness" than did the Colorado detention statute in *Stevens.* Consequently, this Court reasons that the Wyoming statutory scheme is constitutional based on concepts of federalism as outlined in *Stevens,* and the fact that the statutory scheme in *Stevens* was held constitutional.[4]

Furthermore, this Court is persuaded that the Wyoming Emergency Detention statute passes constitutional muster even under strict scrutiny. The Wyoming statute, as

---

4. Another useful way to analyze the constitutionality of the statute is under Fourth Amendment law. Under this analysis, the statute constitutes a codified set of "exigent circumstances" which are constitutional under the Fourth Amendment. *See infra* Section "3," part "a," sub-part "(2)" of this order.

applied, constitutes a reasonable attempt by the state legislature to balance the interests of the mentally ill individual against the interests of the state. The Court disagrees with the plaintiff that the amended "substantial probability" standard deprives her of any more liberty than did the "imminent threat of physical harm" standard, particularly given the inherent uncertainty of both standards.[5] Even if this Court were convinced a better alternative existed to the Wyoming Emergency Detention statutory scheme, the legislature, not this Court, is in the best position to determine what that alternative is and how it should be implemented. *See, generally,* Stephen J. Morse, *A Preference for Liberty: The Case Against Involuntary Commitment of the Mentally Disordered,* 70 CAL.L.REV. 54, 93–103 (1982) (arguing that the benefits of abolishing involuntary civil commitment of mentally ill far outweigh the costs of keeping it) (*hereinafter* Morse); Geraldine A. McAfferty & Jeanne Dooley, *Involuntary Outpatient Commitment: An Update,* 14 MENTAL & PHYS.DISAB.L.REP. 277 (1990) (authors review the pros and cons of involuntary outpatient civil commitment and highlight the legislative trends in this regard).

■ Despite the holding in this order that the Wyoming Statute is constitutional, the Court remains aware that neither the medical nor the legal profession has accurately defined or predicted "dangerousness." *See, e.g.,* PERLIN § 2.07. Nonetheless, courts must attempt to define and evaluate the contours of "dangerousness," especially where, as in this case, a genuine issue of fact exists regarding whether the detainee was dangerous at the time the state detained her.[6] The Wyoming Emergency Detention statute specifically provides that the fact-finder may evaluate whether a detainee posed a substantial probability of harm to him or herself based on "evidence of *recent* threats of or attempts at suicide or serious bodily harm." WYO.STAT. § 25–10–101(ii)(A). (emphasis added).

This phrase admits of two reasonable interpretations. First, the adjective "recent" may modify only the phrase "*threats* of ... suicide or serious bodily harm." Second, the adjective "recent" may modify the phrase

---

**5.** The court points out that the "imminent" requirement the plaintiff urges as the constitutional minimum is not without flaws. Arguably, the mentally ill person who is potentially suicidal may not evidence her suicidal tendencies by posing an *imminent threat* of physical harm to herself or others. As a result, the "imminent threat" standard may be too narrow because it prevents the state from detaining a mentally ill person who evidences suicidal tendencies through abstruse forms of expression such as depression or incompetence. This argument assumes that mentally ill persons who intend to commit suicide do not frequently evidence their intent by posing an imminent threat of danger to themselves. *Cf. In re LaBelle,* 728 P.2d at 145–6 (court evaluates state standard governing mentally ill person's ability to care for themselves, and explains how the expanded "gravely disabled" standard enables the state to treat chronically ill persons before they "decompensate[ ] to the point that they [are] in 'danger of serious ... harm' from their inability to care for themselves."). *But see,* 1 MICHAEL L. PERLIN, MENTAL DISABILITY LAW, CIVIL AND CRIMINAL § 2.13 at 110–15 (1989) (discussing the split in legal authority regarding the overt act/imminent threat requirements) (*hereinafter* Perlin); Reed Groethe (Comment), *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Commitment of the Mentally Ill,* 44 U.CHI.L.REV 562, 583–93 (1977) (arguing in part that the overt dangerous behavior requirement may be but one of many responses to certain constitutional objections to involuntary civil commitment statutes).

**6.** The Seventh Circuit has suggested that courts analyze involuntary civil commitment under the Fourth Amendment. The Seventh Circuit has expressed the test for a reasonable involuntary commitment algebraically in the inequality $C < PH$, where "C" is the cost of confinement to the detainee (i.e., not just economic cost), "H" is the harm the detainee might do if released, and "P" is the probability of the detainee doing that harm if released. A commitment is considered reasonable as long as the cost of confinement to the detainee is less than the probability that the detainee will cause a harm multiplied by the magnitude of the harm. *Villanova v. Abrams,* 972 F.2d 792, 795–97 (7th Cir. 1992) (court evaluates the reasonableness of an involuntary commitment drawing on Fourth Amendment "probable cause" analysis).

While the algebraic formula itself does not help define "dangerousness," this Court offers the formula to the parties both as an analytical tool and as a source for jury instructions. *See also Lessard v. Schmidt,* 379 F.Supp. 1376, 1380 (E.D.Wis.1974) (court defined dangerousness based on four components: the type of behavior, the recency of behavior, the severity of resulting harm, and the likelihood of (re)occurrence).

"*attempts* at suicide or serious bodily harm" in addition to threats of the same. If the Court follows the first interpretation, the defendants could present evidence at trial of Moore's attempted suicides, recent or not, plus evidence of recent threats of suicide. Under the second interpretation, the Court would limit the defendants to presenting only evidence of recent threats and recent attempts.

The Court reasons that "recent" modifies both phrases. Common sense dictates that recent attempts at suicide or serious bodily harm, in addition to recent threats of the same, will be more probative of the detainee's dangerousness than non-recent attempts. *See; e.g., United States v. Atwell,* 766 F.2d 416, 421 (10th Cir.1985) (more recent evidence had probative value). Additionally, short-term predictions of dangerousness appear to be more accurate than long-term ones. PERLIN § 2.15, at 127–28 n. 517 (citing MENZIES, ET AL., *The Dimensions of Dangerousness: Evaluating the Accuracy of Psychometric Predictions of Violence Among Forensic Patients,* 9 LAW & HUM.BEHAV. 49, 67 (1985) (medical professionals should limit themselves to short-term predictions of dangerousness)). Therefore, this Court concludes that limiting the defendants to evidence of recent threats and recent attempts of suicide is consistent with the statute's requirement that a potential detainee exhibit a *substantial* probability that she might harm herself or others.

## 2. Whether defendant Wyoming Medical Center acted under color of state law.

■ Under the "public function" test for state action, a court may examine "the structure of the entity and its relationship to a governmental unit" to determine whether a private entity is a state actor under 42 U.S.C. § 1983. *Milo v. Cushing Mun. Hosp.,* 861 F.2d 1194, 1196 (10th Cir.1988) (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). *See also, Yeager v. City of McGregor,* 980 F.2d 337, 342–43 (5th Cir.1993) (government-funded hospital not a state actor under § 1983); *Carnes v. Parker,* 922 F.2d 1506, 1509 (10th Cir.1991) (government-funded hospital was a

state actor under § 1983); *Albright v. Longview Police Dept.,* 884 F.2d 835, 840–41 (5th Cir.1989) (government-funded hospital not a state actor); *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.,* 807 F.2d 1214, 1221–22 (5th Cir.1987), *mod. on other grounds and reh'g en banc denied,* 819 F.2d 545 (5th Cir.1987), *cert. denied sub nom., Harris Methodist H–E–B Board of Trustees v. Jatoi,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988) (government-funded hospital was state actor).

■ A careful reading of both the Fifth and Tenth Circuit case law regarding the "public function" test leads this Court to consider the following three factors in deciding whether Wyoming Medical Center is a state actor:

(1) whether the County receives a "direct financial benefit" from the private lessee, Wyoming Medical Center;

(2) whether the County "benefitted" from the actual complained of violation(s);

(3) whether the County retained "control [of] and responsibility" for the hospital;

*Albright,* 884 F.2d at 839–41; *Milo,* 861 F.2d at 1196–97.

In the instant case, "it cannot be disputed that some kind of relationship exists between [Natrona County, Wyoming] and [Wyoming Medical Center]." 861 F.2d at 1196. Natrona County owns the physical facilities used by the medical center. Wyoming Medical Center receives funds from county mill levies and from sales tax revenue. The Board of Commissioners of Natrona County, Wyoming, in conjunction with the medical center's Board of Trustees, issued revenue bonds in 1990 in the principal amount of $16.5 million. Wyoming Medical Center services this debt from "net pledged revenues." The county mill levies, the sales tax revenues, and the bond indebtedness, together, comprised the majority of Wyoming Medical Center's net assets in 1989 and 1990.

Furthermore, section 4.2 of the operating lease between Natrona County and the medical center states that:

[A]s long as the amount of indigent care furnished by [Wyoming Medical Center]

together with premiums paid by [Wyoming Medical Center] for property insurance ... do not exceed, on an annual basis, five percent (5%) of the gross hospital operating revenues of [Wyoming Medical Center], ... then the payment of insurance premiums and the providing of indigent care by [Wyoming Medical Center] shall fulfill the rental obligation hereunder.

Section 5.1 of the lease provides that the property is exempt from county taxes. Section 9.1 of the lease provides that Natrona County may terminate the lease if Wyoming Medical Center fails to "discharge its public service mission and that the public interest is no longer being served by the continuation of this lease."

The Court finds that the relationship between Natrona County and Wyoming Medical Center amounts to state action for three reasons. First, Natrona County benefits from Wyoming Medical Center because the two entities are "financially interdependent." 884 F.2d at 850. The lease states that Wyoming Medical Center will provide indigent care to the county. The medical center's bond indebtedness, in which the county is a principal lender, must be serviced by the medical center's revenues. The medical center receives substantial benefits from the county in the form of reduced taxes and rent.

Second, Natrona County "benefitted" from the complained of activities because Wyoming Medical Center has a duty to service indigent patients according to the terms of its lease with Natrona County. Plaintiff Moore, who is indigent, complains that the defendants unlawfully detained her. This detention occurred as a result of services performed by Wyoming Medical Center's paramedics and emergency medical technicians. Moreover, non-indigent patients pay for these services so that indigent patients may receive care and treatment. The medical center uses revenues derived from these medical activities to service its bond indebtedness and to keep the hospital running, both of which directly benefit the county. Thus, Natrona County benefits from the services rendered by the defendants pursuant to the lease agreement. *Compare Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 723–

25, 81 S.Ct. 856, 860–62, 6 L.Ed.2d 45 (1961) (governmental entity economically benefitted from private entity's discriminatory policies).

Third, the County retains responsibility for the hospital. The lease provides that Natrona County ultimately determines whether the medical center properly discharges its public mission, although the County does not appear to control Wyoming Medical Center's day-to-day activities. The Tenth Circuit has held that a county may not insulate itself from liability by delegating its responsibility to operate a public hospital to a private entity. *Carnes,* 922 F.2d at 1509; *Milo,* 861 F.2d at 1197. Thus, Natrona County remains responsible for Wyoming Medical Center's actions even though Natrona County may not directly control the medical center's day-to-day operations.

This Court rejects the defendants' argument that the Fifth Circuit's reasoning regarding "responsibility and control" in *Albright* should trump the Tenth Circuit reasoning in *Carnes* and *Milo.* In *Albright,* the Fifth Circuit distinguished its earlier decision in *Jatoi.* The *Albright* court reasoned that, in *Jatoi,* the especially created governmental entity, whose purpose it was to oversee the hospital's operations, caused the county to be "informed of decisions, including the decision to terminate Dr. Jatoi's privileges." 884 F.2d at 840. The *Albright* court found dispositive that, in *Jatoi,* the especially-created governmental entity retained "the ability to *prevent or control* the complained of conduct." *Id.* at 841. (citation omitted) (emphasis added).

However, unlike the Fifth Circuit, the Tenth Circuit does not find the "responsibility and control" factor dispositive of the state action issue. Instead, the Tenth Circuit takes a more expansive view of the "responsibility and control" factor, appearing to emphasize the "responsibility" aspect more than the "control" aspect. The *Carnes* and *Milo* decisions implicitly left room for the possibility that a private hospital may become a state actor pursuant to section 1983 even though the county was not "informed of [the private party's] decisions" as in *Jatoi. See specifically, Yeager,* 980 F.2d at 342, 342 n. 9;

*compare Carnes,* 922 F.2d at 1509; *Milo,* 861 F.2d at 1197.

■ The plaintiff's alternate theory regarding state action—that the defendants acted "in concert" with city police and firefighters—is moot insofar as this Court finds that the defendants served a public function. However, the Court notes that it would also find state action under the "in concert" test for at least two reasons. First, the Wyoming Emergency Detention Statute itself states that a mentally ill person may be detained when a *police officer* or medical examiner has reasonable cause to believe the mentally ill person is dangerous. WYO.STAT. § 25–10–109. Second, substantial evidence exists in the record to support the proposition that Wyoming Medical Center acted in concert with the Casper Police and Fire Departments to detain Moore. Deposition of Robert Dean at 84–6; Deposition of Art Washut at 21:8–11, 22:7–13, 23:13–23; Deposition of Michael Hendershot at 13:11, 26:3–16.

### 3. Whether the defendants may assert the defenses of qualified immunity, or municipal immunity under the *Monell* doctrine.

#### a. qualified immunity.

■ Defendants Weaver and Hendershot assert the defense of qualified immunity.[7] However, the recent Supreme Court case of *Wyatt v. Cole* casts a significant shadow over Weaver and Hendershot's assertion. In *Wyatt,* the Supreme Court held that qualified immunity was unavailable to private defendants faced with Section 1983 liability for invoking a state replevin, garnishment or attachment statute. —— U.S. ——, ——, 112 S.Ct. 1827, 1832, 118 L.Ed.2d 504 (1992).

The *Wyatt* Court reasoned as follows: First, the Supreme Court explained that qualified immunity defense finds its support in common law traditions and other "strong policy reasons." *Id.* at —— – ——, 112 S.Ct. at 1830–31. However, the Court opined that "irrespective of the common law support, we will not recognize an immunity available at

common law if § 1983's history or purpose counsel against applying it in § 1983 actions." *Id.*

Next, the Supreme Court found that common law did not protect private persons who instituted attachment actions from malicious prosecution or abuse of process actions. The Supreme Court further explained that the policy reasons announced in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) for keeping insubstantial claims against public officials from going to trial did not apply in the attachment context. *Id.* at ——, 112 S.Ct. at 1833. Qualified immunity protected government officials only "where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damage suits from entering public service." *Id.*

The Supreme Court refused to extend qualified immunity to private parties in the case before it for two main reasons. First, private parties do not hold an office requiring them to exercise discretion in which they principally strive to enhance the public good. Second, the public interest is not "unduly impaired" if private parties go to trial because private parties are not government officials performing discretionary functions. The Supreme Court summarized its thinking by stating that "[i]n short, the nexus between private parties and the historic purpose of qualified immunity is simply too attenuated to justify such an extension of our doctrine of qualified immunity." *Id.* at —— – ——, 112 S.Ct. at 1833–34. *Wyatt* left open the issue of whether "private defendants faced with § 1983 liability under *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private parties, rather than governmental parties, could require plaintiffs to carry additional burdens." *Id.*

For reasons detailed below, this Court rules that, under *Wyatt,* the defendants are not entitled to qualified immunity. As a

---

**7.** Wyoming Medical Center did not assert the qualified immunity defense. *See* footnote 8, *infra.*

result, the Court need not decide whether the defendants would succeed with their defense if it applied as a matter of law.

### (1) *Wyatt* analysis.

The issue of how *Wyatt* affects private parties acting pursuant to a state's emergency detention statute is one of first impression. Prior to *Wyatt*, the Tenth Circuit, similar to other circuits, had granted qualified immunity to private parties characterized as state actors under Section 1983 in certain circumstances. *See DeVargas v. Mason & Hangar–Silas Mason Co.*, 844 F.2d 714, 724–25 (10th Cir.1988) (private party defendants entitled to qualified immunity where they acted pursuant to duties imposed by a government contract, and plaintiff sued defendants solely on the basis of acts performed pursuant to that contract); *see also Dorothy J. v. Little Rock School Dist.*, 794 F.Supp. 1405, 1423 n. 12 (E.D.Ark.1992) (court noted split among circuits prior to *Wyatt* decision and lists cases); *Jordan v. Berman*, 792 F.Supp. 380, 388–390 (E.D.Pa. 1992) (court analyzed split in the circuits; held that, under Section 1983, a private party may assert qualified immunity in a suit for utilizing an existing state attachment process later found to be unconstitutional).

The Court finds instructive two recent cases: *Burrell v. Board of Trustees of Georgia Military College*, 970 F.2d 785 (11th Cir. 1992) and *Sherman v. Four County Counselling Center*, 987 F.2d 397 (7th Cir.1993). In *Burrell*, the plaintiff alleged that public officials and private persons conspired to fire her from her job in retaliation for her public criticism of the Georgia Military College. 970 F.2d at 787. The *Burrell* court first analyzed three cases in which courts had granted qualified immunity to private parties who were held to be state actors under Section 1983. These cases involved, respective-

ly, a private party acting pursuant to a government contract fulfilling a government function; parties fulfilling statutorily mandated duties under a contract; and, a physician acting pursuant to a court order. *Id.* at 795. The *Burrell* court compared this strain of cases to those in which courts had denied qualified immunity. These latter cases involved private parties which had invoked state law in pursuit of private ends. *Id.* The *Burrell* court reasoned that:

> [W]here the private defendants are not alleged simply to have fulfilled their duties under a government contract, or to have assumed under court order the responsibilities of a public official, but are alleged to have acted in concert with public officials for the sole purpose of depriving another of her constitutional rights, private defendants cannot claim the protection of qualified immunity.... Private individuals who associate themselves with a public official to encroach on another's constitutional rights must bear the risk of trial.

*Id.* at 796. The *Burrell* opinion stressed that qualified immunity reflects a policy decision "that it is better to have public officials make mistaken decisions based on a good faith interpretation of the law, than not to make any decisions at all." *Id.* The *Burrell* court concluded that such a policy did not protect "private individuals [who] redress their differences with another person by conspiring with public officials to deprive that person of his or her constitutional rights." *Id.*

By contrast, in *Sherman*, the Seventh Circuit granted qualified immunity to defendant Four County Counseling Center ("the Center") because the Center was ordered by the state court to detain a plaintiff against his will and to treat him accordingly.[8] 987 F.2d at 405. The *Sherman* court reasoned that

---

8. The *Sherman* court seemed to assume that it was proper to treat Four County Counseling Center as an individual acting in his/its official capacity. Treating the Counseling Center in this way raised the specter of qualified immunity.

However, in the case at bar, such an assumption regarding the Wyoming Medical Center may not be warranted. Arguably, a private corporation which performs a public function or acts in concert with state actors is not an individual, but is, in effect, the municipality itself raising the

specter of *Monell*-type immunity, not qualified immunity. *See e.g., Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408–09 (2d Cir.1990) (*Monell's* rationale extends to private businesses even though *Monell* itself dealt with municipal employers). To be thorough, this Court analyzes whether all the defendants are entitled to qualified immunity, and whether defendant Wyoming Medical Center itself is entitled to municipal immunity under *Monell*.

the policies underlying qualified immunity applied with "full force" to the Center:

> Although it is a private hospital, Four County accepted and cared for a state mental patient committed on an emergency basis. Its role is analogous to the school board members the Supreme Court expressed concern about in *Wyatt*, [——] U.S. [——], 112 S.Ct. at 1833–34. Four County was fulfilling a public duty. If the actions it took pursuant to court order subject it to suit, private hospitals might well refuse to accept involuntary patients. This refusal would increase the load on the strained resources of the state's public hospitals. The *Wyatt* Court noted that the one purpose of qualified immunity is to avoid discouraging public service. *Wyatt*, at [——], 112. S.Ct. at 1833. Denying qualified immunity to private hospitals in this situation would do just that. Moreover, in some instances, admission at smaller local private hospitals benefits the involuntary patient by minimizing the disruption of the patient's life. It allows the patient to be evaluated close to home and family. We believe the public interest in maximizing the number of facilities available for the detention and treatment of the mentally ill is best served by not exposing private facilities to liability for discretionary medical judgments made pursuant to court order. (citation omitted).

> Like the First Circuit, we distinguish this case from those in which private parties "voluntarily engaged in illegal activities in the advancement of their own self-interest." *Felix De Santana [v. Velez]*, 956 F.2d [16,] at 20 [*cert. denied*, —— U.S. ——, 113 S.Ct. 59, 121 L.Ed.2d 28 (1992)]. We refuse to give private hospitals the Hobson's choice of obeying a court's order directing discretionary medical treatment, and facing liability for the resulting medical judgment, or refusing to make a medical judgment, and exposing hospital staff and patients to the risk of harm posed by a potentially violent mental patient.

*Id.* at 406.

This Court is persuaded that the instant case more closely resembles *Burrell* than *Sherman*, for at least three reasons. First,

Wyoming Medical Center did not act pursuant to a government contract, though it acted pursuant to its general obligations outlined in its lease agreement with Natrona County. Nor did the defendants in this case assume the responsibilities of a public official under court order as the defendant did in *Sherman*.

Second, in the context of detaining mentally ill individuals, this Court does not find that "it is better to have [Wyoming Medical Center personnel] make mistaken decisions based on a good faith interpretation of the law, than not to make any decisions at all." 970 F.2d at 796. Law review literature strongly suggests that the mentally ill individual stands to lose more than the state in the event the state detains the mentally ill individual erroneously. *See* Morse, 70 Cal. L.Rev. at 59–86 (arguing that mentally disordered persons should not be legally distinguished from normal persons, and that the involuntary commitment system produces unacceptable numbers of improper commitments); Note, *Developments in the Law: Civil Commitment of The Mentally Ill*, 87 Harv.L.Rev. 1190, 1297–1303, 1299 n. 205, 1386–1406 (1974) (arguing that, for involuntary commitment, the disutility of error is much larger for the mentally ill individual than for the state; suggesting that the state regularly seek to employ less restrictive alternatives to involuntary commitment; and, that the goal be "compassionate and enlightened treatment of the mentally ill").

Third, this Court does not believe that the only instances in which the *Wyatt* reasoning should apply is when a defendant's *only* purpose is to deprive a plaintiff of her constitutional rights. In the instant case, the defendants may have deprived plaintiff Moore of her constitutional rights despite the fact they did not act "in concert with public officials for the *sole purpose* of depriving" the plaintiff of her rights. 970 F.2d at 796. (emphasis added). Thus, this Court concludes that the policies underlying qualified immunity do not apply with "full force" to the defendants in the context of this emergency detention and, therefore, the defendants at bar may not invoke the defense.

**(2) the right violated.**

This Court need not determine whether qualified immunity would shield the defendants' actions because the defendants may not assert the defense pursuant to *Wyatt.* However, the Court finds it useful to discuss the issue principally for purposes of clarifying the plaintiff's claims for trial.

■ To rebut an assertion of qualified immunity, a plaintiff must (1) identify the right allegedly violated, and (2) show that the right allegedly violated was a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known.". *DeVargas,* 844 F.2d at 723–24 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738).

Regarding the right(s) allegedly violated, plaintiff Moore complains that the defendants deprived her of her "right of liberty, right of privacy, right of bodily integrity, right to counsel, right to remain silent, and right to be free from personal and emotional injury, assault, battery, false imprisonment, outrageous conduct and unlawful detention." Plaintiff's First Amended Complaint at 3. Plaintiff further complains that the defendants deprived her of her constitutional rights by utilizing excessive force during the detention. *Id.* at 4. Plaintiff's complaint asserts a 'mixed bag' of rights which appears to include liberty interests sources in substantive and procedural due process, the Sixth Amendment right to counsel, the Fifth Amendment right to remain silent and the Fourth Amendment right against unreasonable search and seizure.

■ "Protected liberty interests may arise from two sources—the Due Process clause itself and the laws of the states." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). Liberty under the Due Process clause is broader than

"freedom from bodily restraint." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Liberty is not

> a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgement.

*Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1960) (Harlan, J., dissenting).

A fair reading of plaintiff's complaint and the briefs and materials submitted in support indicate that the issues of material fact raised by the plaintiff relate to a seizure of the person under the Fourth Amendment.[9] For example, the plaintiff alleges that her initial conversation with Susan Crabtree did not provide the defendants with reasonable cause to detain her. As another example, the plaintiff alleges that Weaver and Hendershot removed her from her bathroom without provocation, and that the two men used excessive force in detaining her at her home. The Court acknowledges that the plaintiff also claims that the defendants violated her right to counsel and her right to remain silent during the detention. However, the plaintiff asserts these rights pursuant to the state detention statute. *See* WYO.STAT. §§ 25–10–109(f) and (g). Thus, the plaintiff's right to counsel and right to remain silent derive from the allegedly unlawful detention.

■ It is well established that claims of substantive due process may include the sub-

---

9. Supreme Court case law makes clear that the Fourth Amendment protects against unreasonable seizures of a person. *See Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (citing *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)) (an officer seizes a citizen when that officer uses physical force or shows sufficient authority such that the officer restrains

the citizen's liberty); *California v. Hodari D.,* 499 U.S. 621, ——, —— – ——, 111 S.Ct. 1547, 1548, 1557–61, 113 L.Ed.2d 690 (1991) (proposition cited by majority and dissenting opinions) (the "quintessential" seizure of a person occurs when an officer physically restrains a citizen or show authority in a manner which restrains a citizen's liberty).

stantive due process rights recognized or derived from both the Constitution and the Bill of Rights. *See e.g., Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 542–47, 97 S.Ct. 1932, 1957–60, 52 L.Ed.2d 531 (1976) (White, J., dissenting); *Griffin v. Strong,* 983 F.2d 1544, 1546 (10th Cir.1993). Fourth Amendment law generally states that a search and seizure require probable cause and a warrant. However, the warrant requirement may be excepted under "exigent circumstances." *See, e.g., Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990). This Court reasons that the Wyoming Emergency Detention statute effectively authorizes the seizure of a mentally ill individual under legislatively designated "exigent circumstances." These exigent circumstances occur when an officer or medical examiner has "reasonable cause" to believe that an individual is mentally ill, and the officer or examiner further determines that the individual is "dangerous" as a result of mental illness. WYO.STAT. §§ 25–10–109(a), 25–10–101(ii); *see also, Gooden v. Howard County, Maryland,* 954 F.2d 960, 968 (4th Cir.1992) (after explaining that the concept of "dangerousness" is a slippery one, the court stated that "Of course, the law in no way permits random or baseless detention of citizens for psychological evaluations."). Plaintiff Moore alleges that defendants Weaver and Hendershot, acting on behalf of Wyoming Medical Center, broke into her home, forcibly detained her, and then removed her from her home against her will. In other words, Moore alleges that the defendants performed an unreasonable seizure of her person which included the use of excessive force.

The facts in the instant case fit neatly into the Fourth Amendment analytic framework, especially in light of the Supreme Court case of *Graham v. Conner.* In *Graham,* the Supreme Court opined that the two primary sources of constitutional protection against physically abusive governmental conduct are the Fourth and Eighth Amendments. 490 U.S. 386, 393–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). In rejecting the use of substantive due process analysis with regard to claims that a police officer used excessive force, the Supreme Court stated that:

Where, as here, the excessive force claim arises in the context of an arrest of investigatory stop of a free citizen, it is most properly characterized as one invoking the protection of the Fourth Amendment, which guarantees citizens the right "to be secure in their person ... against unreasonable ... seizures" of the person. This much is clear from our decision in *Tennessee v. Garner,* [471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1] [ (1985) ] *supra.* In *Garner,* we addressed a claim that the use of deadly force to apprehend a fleeing suspect who did not appear to be armed or otherwise dangerous violated the suspect's constitutional rights, notwithstanding the existence of probable cause to arrest. Though the complaint alleged violations of both the Fourth Amendment and the Due Process Clause, ... we analyzed the constitutionality of the challenged application of force solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person, holding that "reasonableness" of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out. Today we make explicit what was implicitly in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Id.* at 394–95, 395 n. 10, 109 S.Ct. at 1871, 1871 n. 10 (citations and footnotes omitted); *see also, Gooden v. Howard County, MD.,* 917 F.2d 1355, 1363, (4th Cir.1990), *reh'g en banc granted and rev'd on other grounds* 954 F.2d 960 (4th Cir.1992) (court adopted Fourth Amendment analysis to determine source of rights for mentally ill person who

was detained because he was dangerous). This Court applies the reasoning in *Graham* to the instant case, and thus concludes that the principal constitutional right asserted by plaintiff is her right against an unreasonable seizure of her person, derived from the Fourth Amendment.

 Consequently, the critical issue at trial will be whether the defendants seized or detained Moore in a reasonable manner.[10] *See Villanova v. Abrams,* 972 F.2d 792, 795–97 (7th Cir.1992). Plaintiff Moore contends that the defendants did not have probable cause to detain her, and seized her from her home in an unreasonable fashion. By contrast, the defendants contend that they detained Moore in accordance with the Wyoming Emergency Detention statute and, therefore, in a reasonable manner. This Court finds that the factual disputes between the parties are substantial and material on these issues and, thus, the case must be presented to a fact-finder.

In turn, whether the defendants had probable cause or performed the seizure in a reasonable fashion depends on whether, in fact, Moore was mentally ill at the time, and whether, in fact, Moore's mental illness caused her to be dangerous at the time. The Supreme Court has held that the state actor must prove these facts by clear and convincing evidence to justify the detention. *Addington v. Texas,* 441 U.S. 418, 423, 431–32, 99 S.Ct. 1804, 1807, 1812–13, 60 L.Ed.2d 323 (1979) (Court held that the higher standard of proof more accurately reflected the interests at stake in an involuntary civil commitment). Thus, under *Addington,* the defendants will have to prove that they complied with the standards articulated in the Wyoming Emergency Detention Statute by clear and convincing evidence to prevail at trial.

### b. the *Monell* doctrine.

 If defendant Wyoming Medical Center is not entitled to qualified immunity under *Wyatt v. Cole,* then the same reasoning precludes Wyoming Medical Center from asserting municipal immunity pursuant to *Mo-*

*nell v. New York City Dep't of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* the Supreme Court held that a municipality cannot be held liable under a *respondeat superior* theory. Instead, *Monell* requires that "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, [must] inflict[ ] the injury" for the municipality to be liable. 436 U.S. at 694, 98 S.Ct. at 2038.

After *Monell,* several circuits held that "municipal immunity" extended to private corporations that acted under color of state law. *See, e.g., Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408–09 (2d Cir. 1990) (*Monell's* rationale extends to private businesses even though *Monell* itself dealt with municipal employers); *Iskander v. Village of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982) (private corporation may not be held vicariously liable under § 1983 for its employees' deprivations of others' civil rights); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir.1982) (nothing in *Monell* suggests that municipal immunity should not be extended to a private corporation acting pursuant to § 1983). However, courts decided these cases before *Wyatt.*

The Supreme Court articulated two "mutually dependent rationales" in support of *Monell*-type immunity. *See Scheuer v. Rhodes,* 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974). First, "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion." Second, "the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." *Id.*

In *Sala v. County of Suffolk,* the Second Circuit cogently explained the two rationales as follows:

> The first of these [rationales] is in large part peculiar to the context of individual

---

10. The Court uses the words "seize," "seizure of the person" and "detention" interchangeably from this point forward.

official immunity [i.e., qualified immunity for individual officers]. The sense of injustice felt at the prospect of holding an individual officer liable in damages when he acted reasonably and in good faith is greatly diminished when the liability is to be affixed to a municipality, even if its responsible officials acted reasonably in the light of the then-existing law. Although "we are not insensitive to the financial plight of local governmental bodies" and wish to avoid "needlessly expand[ing] recovery at the expense of already overburdened taxpayers," *Turpin v. Mailet,* [579 F.2d 152, 165 (2d Cir.) *vacated on other grounds,* 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978) ], "fiscal considerations alone cannot stand in the way of the vindication of constitutional rights." *Id.* at 165 n. 38.

But, the second rationale discussed in *Scheuer* [*v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90] [ (1974) ] retains more relevance in the context of municipal liability. The fear that the possibility of liability will unduly inhibit "the vigorous exercise of official authority," *Butz v. Economou,* [438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978) ], is central to the concept of governmental immunity. As the Court said in ·*Scheuer,* [416 U.S. at 241, 94 S.Ct. at 1689], "one policy consideration seems to pervade the analysis: the public interest requires decision and action to enforce laws for the protection of the public." Although the detrimental effect that unforeseeable municipal liability may have on forceful decision making may be less direct than in the case of personal liability, it is clear that the threat of such liability may inhibit public officials from "mak[ing] decisions when they are needed or ... act[ing] to implement decisions when they are made." *Id.* at 241–42 [94 S.Ct. at 1689].

604 F.2d 207, 210–11 (2d Cir.1979), *vacated on other grounds,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980) (no good faith defense for strip search performed pursuant to county policy); *see also Owen v. City of Independence,* 445 U.S. 622, 654–57, 100 S.Ct. 1398, 1417–19, 63 L.Ed.2d 673 (1979) (Supreme Court explained why the two rationales failed to support affording municipali-

ties absolute or qualified immunity); *Ohland v. City of Montpelier,* 467 F.Supp. 324, 341–46 (D.Ver.1979) (district court intelligently outlined policy concerns underlying municipal immunity pursuant to *Monell* ).

This Court holds that *Monell* -type immunity should not extend to private hospitals that act under color of state law to detain potentially dangerous mentally ill individuals. The policy argument that "the possibility of liability will unduly inhibit the vigorous exercise of official authority" does not apply to a private hospital such as Wyoming Medical Center because it simply does not vigorously exercise official authority on behalf of the public good. Furthermore, as ·noted in the "qualified immunity" discussion *ante,* the mental health law literature argues convincingly that courts should carefully guard against state action which erroneously deprives mentally ill persons of their liberty, autonomy and privacy rights. *See additionally,* Donald N. Bersoff, *Judicial Deference to Nonlegal Decisionmakers: Imposing Simplistic Solutions on Problems of Cognitive Complexity in Mental Disability Law,* 46 SMU L.Rev. 329, 362–63 (1992) (arguing, in part, that clinicians' good faith judgments are no more reliable or valid than judgments by laypersons because they persist in using less reliable methods of predicting dangerousness; further, concluding that the Supreme Court's increased preference for informal decision-making in fora controlled by nonlegal professionals and administrators runs contrary to "a whole universe of sound, consensual, and intersecting social science evidence"); Stephen J. Morse, *Treating Crazy People Less Specially,* 90 W.Va.L.Rev. 353, 359, 383 (1987) (arguing, in part, that the law's reliance upon mental health professionals to decide cases concerning mentally disabled persons is grounded in the Supreme Court's fundamentally flawed assumption that the issues in these cases are primarily medical or psychiatric ones; rather, the ultimate issues in these cases concern liberty, autonomy, and dignity and thus "the ultimate question in mental health law is always social, moral, political and legal").

To this end, this Court observes that a private hospital—particularly one not acting

pursuant to a court order as the defendant did in *Sherman*—is the party in the best position to prevent erroneous detentions of the mentally ill. Our society has put the mentally ill individual in the unflattering position of being unable to prevent an erroneous emergency detention. It is, therefore, not enough in this context that a private hospital rely on its employees' good faith misinterpretations of the law. A private hospital which initiates such a detention must take precautions to minimize the risk of an erroneous deprivation of that mentally ill person's constitutional rights. For these reasons, this Court holds that the defendants at bar should not receive *Monell*-type immunity, and the plaintiff need not prove that the defendants acted pursuant to a policy, custom or practice to prevail at trial.[11]

### 4. State law claims.

██ The defendants raise three additional arguments in opposition to plaintiff's pendant state law claims. First, the plaintiff claims that the defendants acted negligently in all aspects of detaining her, and acted negligently in training its field medical personnel and in caring and managing plaintiff. Plaintiff's First Amended Complaint at 5. In response, the defendants argue both that a plaintiff must present expert testimony to show that a medical care provider's conduct fell below the required standard of care, and that the plaintiff failed to present any such testimony. *See, e.g., Harris v. Grizzle*, 625 P.2d 747, 752 (Wyo.1981).

██ This Court holds that the plaintiff has presented satisfactory expert testimony in the form of officer Art Washut, currently lieutenant with the Casper Police Department, and Bob Dean, the Director of Paramedics at the Wyoming Medical Center. Art Washut's deposition contains testimony regarding the nature and scope of the detention. While Washut's deposition does not reveal whether he is technically an expert regarding emergency detention of the potentially dangerous-mentally ill, Washut's experience with search and seizure as a police officer is highly probative and relevant. In turn, Bob Dean's deposition contains testimony regarding the standard of care required of medical personnel in the field. Dean is the Director of Paramedics at Wyoming Medical Center. Dean's deposition states that he assisted in drafting the policies and procedures manual for pre-hospital protocol and helped train hospital personnel such as Weaver and Hendershot. *See* Bob Dean's Deposition at 5–6, 12–19. On this basis, Dean could be considered an expert.[12] Furthermore, in support of her brief, the plaintiff cites to *Caroline, Emergency Care in the Streets*, a manual which appears to establish the basic standard of care for medical field personnel in situations such as the case at bar.

Second, plaintiff complains, in the alternative, that the defendants' actions amounted to a civil conspiracy against her. The defendants respond that the plaintiff's claim is not cognizable in the state of Wyoming. Generally, state courts have held that each member of a civil conspiracy is responsible as a joint tortfeasor regardless of whether or not he directly participated in the unlawful activity. *See, e.g., Aronow v. LaCroix*, 219 Cal.App.3d 1039, 1047, 268 Cal.Rptr. 866, 871 (Cal.Sup.

---

**11.** If this Court were to find that private parties such as Wyoming Medical Center were entitled to municipal immunity, it is not clear how the *Monell* "deliberate indifference" standard could be logically reconciled with the "clear and convincing" standard of proof articulated in *Addington, supra*. It is difficult to imagine, on one hand, that the defendants would have to prove by clear and convincing evidence that the plaintiff was mentally ill and dangerous as a result of that mental illness; while, on the other hand, the plaintiff would have to prove that the defendant Wyoming Medical Center exhibited deliberate indifference in failing to properly train Weaver and Hendershot regarding detention of the mentally ill.

**12.** Additionally, the facts of this case fit the state-law exception to the rule that a plaintiff must present expert testimony to make out a prima facie case of medical negligence. In *Stundon v. Stadnik*, 469 P.2d 16, 22 (Wyo.1970), the Wyoming Supreme Court held that a court may not require expert testimony to establish the standard of care where "the conduct is so obviously wanting in reasonable medical skill and prudence that it may be so adjudged even by laymen." *Id.* Arguably, the case at bar is such a case when the Court examines the facts in a light most favorable to the nonmovant, here the plaintiff.

Ct.1990). Wyoming has abolished joint and several liability under Wyoming Statute § 1–1–109. The defendants contend that § 1–1–109 pre-empts the civil conspiracy cause of action because, if she prevails, Moore may not impose joint and several liability on multiple defendants as a matter of law. The defendants urge, in any event, that the plaintiff has failed to allege sufficient facts to withstand their motion for summary judgment regarding the civil conspiracy cause of action.

■■■■■ This Court does not decide whether Wyoming Statute § 1–1–109 pre-empts a civil conspiracy cause of action because the Court finds that the plaintiff failed to raise a genuine issue of material fact regarding her civil conspiracy claim. A civil conspiracy requires an unlawful objective, a meeting of the minds with regard to that objective and means of obtaining the objective, one or more overt acts, and damages as the proximate result thereof. *McGlasson v. Barger,* 163 Colo. 438, 431 P.2d 778, 779 (1967); 16 Am.Jur.2d Conspiracy § 50 at 268 (1979); *see generally* Jerry Whitson, Note, *Civil Conspiracy: A Substantive Tort?,* 59 B.U.L.Rev. 921 (1979). Moreover, the gist of civil conspiracy is not unlawful agreement, but the damage resulting from that agreement or its execution. *See, e.g., Sidney Morris & Co. v. National Ass'n of Stationers, Inc.,* 40 F.2d 620, 624 (7th Cir.1930); 16 Am.Jur.2d Conspiracy § 52 at 269 nn. 71, 72 (1979).

The Court can find nothing in the materials submitted by the plaintiff which substantiates her allegations that Wyoming Medical Center, Weaver and Hendershot, Dr. Ronald D. Iverson and/or Susan Crabtree conspired to unlawfully detain the plaintiff pursuant to the Wyoming Emergency Statute. The materials submitted particularly lack evidence or inference in support of the element that the defendants formulated an unlawful objective and a means of obtaining the objective. *See, e.g.,* Depositions of Becky Moore at 53; Art Washut at 64; Susan Crabtree at 45; Dr. Ronald Iverson at 40.

Typically, plaintiffs bring civil conspiracy claims against defendants who attempt to defraud them. *See, e.g., Jurkovich v. Estate of Tomlinson,* 843 P.2d 1166, 1172 (Wyo. 1992). The instant case is not about fraud, but concerns an unreasonable seizure of the person. The facts at bar do not square with the civil conspiracy cause of action; and, thus, the Court grants summary judgment with respect to that claim.

■■■■■ Third and finally, the defendants raise the defense that plaintiff's tort claims of assault and battery, false imprisonment and outrage are barred by "statutory privilege." The defendants cite in support of this proposition *Celestine v. United States,* 841 F.2d 851, 853 (8th Cir.1988). In *Celestine,* the plaintiff, Mr. Celestine, voluntarily admitted himself to a Veteran's Administration Hospital because of his self-described suicidal and assaultive tendencies. Celestine became belligerent and physically violent during his admission to the hospital. Security guards restrained him. Celestine eventually underwent six days of treatment at the hospital and left against the advice of his treating psychiatrist. *Id.* at 852.

Celestine sued the hospital pursuant to the Federal Torts Claims Act for battery and false imprisonment. The Eighth Circuit held that the security guards at the hospital justifiably detained Celestine when he was being admitted to the hospital. The *Celestine* court relied on the relevant state statute which provided that a person believed to be mentally ill and dangerous may be restrained. *Id.* at 853.

The Court finds that the facts in *Celestine* differ substantially from the case at bar. Unlike *Celestine,* plaintiff Moore was involuntarily admitted to Wyoming Medical Center. Unlike *Celestine,* the parties dispute the reasonableness of plaintiff Moore's detention. Thus, this Court concludes that the defendants' "statutory privilege" argument must fail.

THEREFORE IT IS

**ORDERED** that the defendants' Motion for Summary Judgment be, and the same hereby is, **DENIED** except with respect to the plaintiff's civil conspiracy cause of action.

**ORDERED** that the defendants' Motion for Summary Judgment be, and the same

hereby is, **GRANTED** only with respect to the plaintiff's civil conspiracy cause of action.